UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| ENJOLI PESSANHA-MAULE,<br><br>                 Plaintiff,<br><br>   v.<br><br>PIERCE COUNTY et al.,<br><br>                 Defendants. | CASE NO. 3:24-cv-05601-DGE<br><br>ORDER DENYING THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 31, 35) |

Before the Court are cross-motions for summary judgment. (Dkt. Nos. 31, 35.) Plaintiff, as guardian and conservator of Nathaniel Woods, brings negligence and constitutional claims against Defendants for injuries Nathaniel Woods suffered while at the Pierce County Jail. For the reasons discussed herein, both motions (Dkt. Nos. 31, 35) are DENIED.[1]

**I     BACKGROUND**

**A. Risks to Sex Offenders at the Pierce County Jail**

---

[1] Plaintiff also asks the Court to grant summary judgment on damages. Because the Court does not grant summary judgment on her negligence claims, it offers no comment on the claimed damages.

ORDER DENYING THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 31, 35) - 1

1    The jail utilizes a program known as "Northpoint" to classify and house inmates. (Dkt.
2  No. 21-2 at 7.) Northpoint uses a 9-level classification system; highest security inmates are
3  classified as Level 1s, lowest security inmates are classified as Level 8s, and unclassified
4  individuals are Level 9s. (Dkt. No. 33 at 2.) At booking, a classifications deputy uses
5  Northpoint to review an inmate's criminal history, classify the inmate, and then make decisions
6  on where to house an inmate. (Dkt. No. 21-2 at 4.) After initial booking, classifications deputies
7  also receive classification questions from inmates, respond to those requests, and make
8  additional classification and housing decisions. (*Id*.) After the initial classification and
9  placement, only ongoing behavior and not criminal history is considered in determining whether
10 to re-classify an inmate or move them to a different unit. (*Id*. at 5.)

11   An inmate's sex offense in and of itself is not generally considered when classifying an
12 inmate for placement within the jail, unless the sex offense is attached to other criminal behavior
13 such as an assaultive felony. (Dkt. No. 36-4 at 10.) Sex offenses will only be considered in
14 making placement decisions if an inmate requests protective custody. (*Id*. at 15.) "In a perfect
15 world," the jail believes sex offense history should be considered, but it apparently is not. (*Id*.)

16   The jail acknowledges that "individuals that have sex offenses against children get
17 assaulted in the jail." (Dkt. No. 41-3 at 8.) This is because it is "common knowledge . . . that
18 child molesters are not well-liked among other inmates within the jail and they are subject to
19 being assaulted." (*Id*. at 9.) Sex offenders, whether convicted or accused, "are at increased risk
20 of being targeted for violence in jails." (Dkt. No. 36-4 at 10–11.) Assaults related to inmates
21 who are sex offenders or are accused sex offenders occur more than once a month at the jail. (*Id*.
22 at 12.)

23
24

ORDER DENYING THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 31, 35) - 2

It is known that "certain inmates have issues with other inmates and . . . they will check their papers and ask to see their court paperwork when they come back from court." (*Id*. at 13.) For this reason, inmates may ask that their court documents, such as a judgment and sentence, be placed in an out-of-cell location with their property prior to returning to the jail from court. (*Id*.) Sometimes corrections deputies ("court escorts") will suggest to an inmate that they might not want to take their court documents with them back to the jail. (*Id*. at 13–14.) However, there are no formal policies or trainings relating to deputies "educating inmates about taking their court paperwork back to their cells." (*Id*. at 14.) The jail agrees "it would make sense to have either training or a policy, to make sure all of the [court] transport deputies were educated on" "the risk of taking papers showing a sex offense back into the [jail] cell." (*Id*. at 14–15.)

### B. Samuel Stacy

Samuel Stacy was an inmate at the jail who was listed as being 6 feet, 5 inches tall and weighing approximately 270 pounds. (Dkt. No. 20-5 at 2.). Stacy had been booked into the jail on April 13, 2021 for attempted murder, burglary, assault, and trafficking in stolen property charges. (*Id*. at 2–4.) He had a prior felony history including burglary, theft, drive-by shooting, and unlawful drug and firearm possession convictions. (Dkt. No. 20-3 at 2–3.) Stacy's classifications forms at various points indicate his classification is "THE HIGHEST YOU CAN GO." (Dkt. No. 33-3 at 19–22.)

On June 26, 2022, two jail inmates in Stacy's cell, Victor Duvall and Sirrone Newbern, showed signs of injury. (Dkt. No. 33-4 at 9.) Newbern stated he had fallen in the shower and blamed his sandals. (*Id*.) Duvall, however, stated he had been "jumped" by two inmates, one of whom was Stacy. (*Id*.) The recorded "reason [Stacy] attacked [Duvall] is because of [Duvall's]

1  sex crime charges."[2]  (*Id*.)  Stacy was charged with assault in the second degree for the attack on
2  Duvall.  (*Id*.)  Stacy and the other identified perpetrator were subsequently housed separately
3  from Duvall and Newbern.  (*Id*.)

4  On July 27, 2022 at 6:37 p.m., Stacy was moved to inmate tank 3EA[3] after a corrections
5  deputy recognized that another planned placement might create problems because Stacy would
6  be housed in a location where he could encounter Newbern.  (*Id*. at 8; *see also* Dkt. No. 20-5 at
7  4.)  In recommending Stacy's placement in 3EA rather than the initially planned tank, the
8  corrections deputy identified that Newbern indicated he wanted to "get back at those guys" who
9  had "sucker punched" Newbern on June 26, 2022 after Newbern confronted them about
10 attacking Duvall.  (Dkt. No. 33-4 at 8.)  The corrections deputy sought to avoid any trouble
11 between Newbern and Stacy.  (*Id*.)

12 **C.  Nathaniel Woods**

13 Woods was an inmate at the jail and was listed as being 5 feet, 9 inches tall and weighing
14 approximately 168 pounds.  (Dkt. No. 20-6 at 2.)  Woods had been booked into the jail on March
15 10, 2022 for taking a motor vehicle without permission and for failure to register as a sex
16 offender.  (*Id*. at 2–3.)  The failure to register as a sex offender related to the crime of rape of a
17 child, which Woods committed on his thirteenth birthday.  (Dkt. No. 36-3 at 3.)  Woods also had
18 other criminal history and had been detained at the jail prior to his March 10, 2022 booking.
19 (*Id*.)  Woods was aware of how to make requests to jail staff, known within the jail as "kites," as
20 he had submitted kites for a variety of issues including requests for medical care, for dietary

---

23 [2] Duvall, however, had no sex offense history.  (*See* Dkt. No. 33-5.)
24 [3] This tank has a total of 14 beds.  (Dkt. No. 20-4 at 2.)

ORDER DENYING THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 31, 35) - 4

needs, for assistance with video visitors, to file grievances, and to raise issues regarding other inmate behavior.  (*See generally* Dkt. No. 20-7.)

On July 27, 2022 at 6:23 p.m., Woods was moved to Tank 3EA.  (Dkt. No. 20-6 at 3.)  This is the same location Stacy would be moved to approximately 14 minutes later.  (Dkt. No. 20-5 at 4.)  Prior to July 27, 2022, neither Woods nor Stacy had been housed together.

### D.  Woods and Stacy's Interactions, and the Assault

Gary Jones was another inmate housed in tank 3EA and had been placed there approximately two weeks before Woods and Stacy.  (Dkt. No. 36-1 at 3.)  Jones recalled Woods and Stacy being moved into tank 3EA the night before Stacy assaulted Woods.  (*Id*.)  He recalled they had arrived quietly and went about their business.  (*Id*. at 4.)  But another inmate, Ottahyo Caldwell, reported Woods and Stacy had "a couple of disagreements" over "Stacy monopolizing the in-cell telephone."  (Dkt. No. 21-1 at 6.)

On July 28, 2022, the day after Woods and Stacy were moved to tank 3EA, Woods appeared in Pierce County Superior Court, where he pleaded guilty to, and was sentenced for, failure to register as a sex offender and taking a motor vehicle without permission.  (*See* Dkt. Nos. 33-1; 36-3.)  Each judgment and sentence identified Woods's juvenile conviction for rape of a child.  (Dkt. No. 33-1 at 5; 36-3 at 3.)  The jail's court escorts were responsible for transporting Woods from the jail to court, and back.  (Dkt. No. 36-4 at 3; 4–5.)

Woods returned to the jail with the documents he received in court and apparently placed those documents under his bed before eating lunch and showering.  (Dkt. No. 36-1 at 5.)  Also before showering, Woods sent a kite stating, "CAN YOU MOVE ME OVER TO B TANK PLEASE THANK YOU".  (Dkt. No. 20-7 at 64.)  This request was consistent with his kite sent three days prior, on July 24, 2022, stating, "MAY I PUT IN A REQUEST FOR WHEN I GET

MOVED ON MY REVIEW DATE ON 7/27/22 TO GO BACK TO 3EB"; he had been told "[w]e do not accept housing requests." (*Id*. at 62.) While Woods was in the shower, two other inmates began looking at his court documents and started telling everyone Woods had a "sex crime." (Dkt. No. 36-1 at 5–6.) As soon as Woods completed his shower and dressed, Stacy assaulted him. (*Id*. at 5.) Inmate Jones described that Woods was not prepared for the assault and further described the severity of the assault, which included Stacy picking Woods up, slamming him on the floor, and stomping on his head. (Dkt. Nos. 32-1 at 6; 42 at 3.)

Defendant Nouhoum Sidibe was the correctional officer who first heard signs of fighting, or what he thought sounded like "scuffling." (Dkt. No. 34 at 2.) Sidibe was stationed at a desk in the "cluster station" of tank 3EA. (*Id*.) Sidibe took approximately four seconds to walk the 13–14 steps from his station to the tank gate where the assault was occurring. (*Id*.) Sidibe observed Stacy punching Woods in the head. (*Id*.) Sidibe states he "immediately yelled at Stacy to stop and called for [backup officers using his] radio." (*Id*.) Stacy did not stop and began stomping on Woods's head; Stacy stomped on Woods approximately four times before backup arrived. (*Id*.) The backup officers arrived approximately one minute after Sidibe called them. (*Id*. at 3.) At that point, Sidibe manually unlocked the gate to enter tank 3EA and Stacy ceased assaulting Woods. (*Id*.) Pursuant to jail policy, Sidibe did not unlock the gate until backup arrived. (*Id*.)

In his deposition, Sidibe testified that when he arrived at the gate, Woods was already on the ground. (Dkt. No. 41-1 at 11.) Sidibe heard Woods yelling stop several times, but Stacy continued punching Woods while he was on the ground. (*Id*.) Sidibe told Stacy, "what are you doing? Stop." (*Id*.) When Sidibe called for backup, Stacy heard him and "started using his feet . . . stomping to really hurt [Woods]." (*Id*.)

ORDER DENYING THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 31, 35) - 6

According to inmate Jones, Sidibe came to the gate and said "stop" while the assault was occurring, then walked away. (Dkt. No. 42 at 3.) Jones described Sidibe as "uncaring," "not in any apparent rush," and "walk[ing] away so slowly that it was clear he didn't care about stopping the fight." (*Id*.) Inmate Jones further acknowledged that it "was probably only a few minutes" before the other guards arrived, "but in this situation it felt like a long time." (*Id*.)

Sidibe's declaration in support of Defendants' motion for summary judgment identifies that on the day of the assault, he was equipped with pepper spray, but did not use the pepper spray "in the minute that [he] witnessed the assault." (Dkt. No. 34 at 3.) Sidibe felt he was too far away from Stacy for it to be effective. (*Id*.) He also felt he could not deploy the pepper spray without putting himself in danger because, according to Sidibe, he would "have had to put [his] hand in between the bars of the cell to spray the pepper spray," exposing him to an inmate possibly grabbing his hand or the pepper spray. (*Id*.) Sidibe also noted the pepper spray would have hit Woods. (*Id*.)

During his deposition, Sidibe recalled using pepper spray to attempt to stop a fight in the past involving different individuals. (Dkt. No. 41-1 at 19–21.) But in response to being asked why he did not use the pepper spray to spray Stacy in the face as the tank gate had open bars, Sidibe stated, "I think the distance, it was not going to reach him." (*Id*. at 24.) Sidibe further stated, "if I would have used my OC spray,[4] it wouldn't reach where he was, you know, punching, you know, Woods." (*Id*.)

---

[4] Oleoresin capsicum ("OC") is a chemical in pepper spray. Pepper spray can also be referred to as OC spray.

ORDER DENYING THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 31, 35) - 7

The following is a photograph of the tank gate where Sidibe would have been standing at the time of the assault[5]:



In the photograph, the assault occurred in the location where the yellow mop bucket is depicted. (Dkt. No. 41-3 at 11.)  It is approximately "three, four feet" from the gate to where the assault occurred.  (*Id*. at 6.)

E.  **Plaintiff's Expert**

Plaintiff's expert, Robert Ayers, has over 50 years of experience in the corrections environment.  (Dkt. No. 37-2 at 2.)  He was employed as a correctional officer for San Quentin California State Prison for 18 years, working a variety of assignments through the rank of Lieutenant.  (*Id*.)  For eight additional years, Ayers worked in a women's prison and in departmental headquarters, where his responsibilities included budget and fiscal oversight.  (*Id*.

---

[5] The photograph is included in Plaintiff's opposition to Defendants' motion for summary judgment.  (*See* Dkt. No. 40 at 10.)  This photograph is identified as Exhibit 13, bates stamp #400997, to the Minion 30(b)(6) deposition.  (*See* Dkt. No. 41-3 at 10.)

ORDER DENYING THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 31, 35) - 8

at 3.) In 1994, Ayers was appointed as the Chief Deputy Warden at Pelican Bay State Prison. (*Id*.) Ayers retired from California State service in 2000 but continued to be involved in administrative oversight of the California prison system. (*Id*.) In 2005, Ayers was appointed Warden of the San Quentin prison. (*Id*. at 3.) Ayers retired in 2008 but has remained active as a corrections consultant in a variety of forums. (*Id*.) Ayers's curriculum vitae is found as Dkt. No. 37-1.

Ayers opines that "[i]t is common knowledge throughout law enforcement and corrections that sex offenders, especially those involving children, are universally subjected to predation by other inmates." (Dkt. No. 37 at 2.) It also is commonly known that inmates demand to see other inmates' court documents "to identify inmates who, because of their charges, are either unwelcome or will be assaulted." (*Id*.)

Ayers opines the jail had knowledge of Stacy's "predatory risk" because of the June 26, 2022 incident in which Stacy participated in assaulting Duvall. (*Id*. at 3.) Ayers opines, "[w]hen an inmate is known to seek out and attack specific types of other inmates, the institution needs to pay special attention to him and take reasonable actions to prevent his ability to carry out attacks." (*Id*. at 3–4.) According to Ayers, the failure to monitor Stacy through a "lack of proactive intervention underscores a significant lapse in the standard of care expected within correctional environments." (*Id*. at 4.) Ayers further opines that placing Woods with Stacy, who was known to target sex offenders, violated the standard of care. (*Id*.)

Ayers also takes issue with the jail's failure to offer protective custody. "Either during the classification process or when the institution becomes aware of an inmate's sex offense convictions or allegations," Ayers asserts, "they should be offered protective custody." (*Id*. at 5.) According to Ayers, it was not consistent with the standard of care to only offer protective

custody to inmates who know how to ask for it without maintaining a system to educate inmates about how to make protective custody requests.  (*Id*.)

Ayers also faults the jail for not having a process "where inmates have the option to store their paperwork somewhere, rather than taking it with them into a cell with other inmates." (*Id*.)

Lastly, Ayers criticizes Sidibe's response to the incident, opining "Sidibe failed to fulfill his obligation as a peace officer when he did not even attempt to use his issued OC (Oleoresin Capsicum) to stop inmate Stacy from seriously battering inmate Woods." (*Id*. at 6.)  The tank gate's "open bar construction . . . would not have impeded the use of OC." (*Id*.)  According to Ayers, the pepper spray Sidibe was carrying on the day of the assault had an "effective range of" 10 to12 feet." (Dkt. No. 37-2 at 9.)

## II   MOTION TO STRIKE

Defendants move to strike the declaration of Robert Ayers (Dkt. No. 37).  (Dkt. No. 43 at 3–5.)  Defendants argue his opinions "are that Pierce County had a legal duty to perform certain actions and failed in that duty.  These are impermissible expert opinions." (*Id*. at 3.)  Plaintiff responds that Ayers "offers standard of care opinions, not legal conclusions." (Dkt. No. 48 at 2.)

Under Federal Rule of Evidence 702, an expert witness "may testify in the form of an opinion or otherwise" if their expertise "will help the trier of fact to understand the evidence or to determine a fact in issue," the proffered testimony "is based on sufficient facts or data" and "is the product of reliable principles and methods," and "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702.  The expert witness "cannot testify to a matter of law amounting to a legal conclusion." *U.S. v. Tamman*, 782 F.3d 543, 552–553 (9th Cir. 2015).

Defendants do not challenge Ayers's qualifications to offer opinions on the standard of care nor do they assert Ayers has failed to reliably apply any principles or methods to the fact of the case. They assert only that Ayers is offering impermissible legal conclusions.

In general, "[e]xpert testimony is required when an essential element in the case is best established by an opinion beyond the expertise of a lay person." *Seybold v. Neu*, 19 P.3d 1068, 1074 (Wash. Ct. App. 2001). At least one Washington appellate court has determined that "expert testimony is required to establish the appropriate standard of reasonable care needed for handling inmates because it is a specialized issue that involves interrelated issues of jail security, inmates' constitutional rights, and statutory compliance." *Gordon v. Kitsap*, 2015 WL 2124383, *3 (Wash. Ct. App. 2015). Courts in this and other districts have concluded the same. *See Wright v. Washington*, No. 23-cv-1326-BJR, 2025 WL 1501921, *5 (W.D. Wash. May 27, 2025) (concluding plaintiff inmate failed to provide expert testimony establishing applicable standard of care); *District of Columbia v. Carmichael*, 577 A.2d 312, 314 (D.C. Cir. 1990) ("The question of whether prison officials acted reasonably to secure the safety of an inmate is not one within the realm of the everyday experiences of a lay person. The reasonably prudent juror cannot be expected to appreciate the ramifications of prison security as well as the parallel considerations involving the safekeeping of prisoners, and therefore, whether, under given circumstances, reasonable care was exercised . . . . Thus, expert testimony or supporting evidence is necessary to establish that standard.") (quoting *Hughes v. District of Columbia*, 425 A.2d 1299, 1303 (D.C. Cir. 1981)); *Hall v. Kirkegard*, No. CV 14-00011-H-DLC-JTJ, 2017 WL 8787176, *14 ( D. Mont. July 31, 2017), *report and recommendation adopted*, No. CV-14-11-H-DLC-JTJ, 2018 WL 747375, *1 (D. Mont. Feb. 7, 2018), *aff'd*, 806 F. App'x 601 (9th Cir. 2020) (collecting

cases finding that expert testimony is required to assist the jury in understanding the appropriate standard of care in negligence claims against prison officials for failure to protect).

Here, the Court finds Ayers offers appropriate standard of care opinions and that such opinions do not amount to impermissible legal conclusions. Defendants' motion to strike is DENIED.

### III   SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv. Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial—in most civil cases, a preponderance of the evidence. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv.*

1  *Inc.*, 809 F.2d at 630.  The court must resolve any factual issues of controversy in favor of the
2  nonmoving party only when the facts specifically attested by that party contradict facts
3  specifically attested by the moving party.  The nonmoving party may not merely state that it will
4  discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial
5  to support the claim.  *T.W. Elec. Serv. Inc.*, 809 F.2d at 630 (relying on *Anderson*).  Conclusory,
6  non-specific statements in affidavits are not sufficient, and "missing facts" will not be
7  "presumed."  *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888–889 (1990).

## IV    EIGHTH AMENDMENT

9        Plaintiff filed 42 U.S.C. § 1983 claims against both Sidibe individually and the County
10 under *Monell* liability alleging violations of the Eighth Amendment.  Plaintiff's claim against
11 Sidibe is based on Sidibe's "fail[ure] to take appropriate measures to stop the attack, once he
12 learned it was occurring"; specifically, his failure to deploy his pepper spray. (Dkt. No. 40 at 7,
13 10.)  Plaintiff's *Monell* claim against Pierce County is based on Pierce County's lack of "policies
14 or training related to housing inmates with a history of predatorily targeting sex offenders in
15 general population, offering protective custody to sex offenders, and giving sex offenders the
16 opportunity to store their court paperwork outside of their group cell." (*Id*. at 20, 22.)
17       Under § 1983, a plaintiff must demonstrate (1) the conduct complained of was committed
18 by a person acting under color of state law and (2) the conduct deprived a person of a right,
19 privilege, or immunity secured by the Constitution or by the laws of the United States. *Parratt v.*
20 *Taylor*, 451 U.S. 527, 535 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S.
21 327 (1986).

Only Defendants move for summary judgment on Plaintiff's Eighth Amendment claims. Accordingly, all facts are taken in the light most favorable to Plaintiff, provided facts specifically attested by Plaintiff contradict facts specifically attested by Defendants.

**A. Sidibe**

A prison official violates the Eighth Amendment when he "knows that [an inmate] face[s] a substantial risk of serious harm and disregards that risk *by failing to take reasonable measures to abate it*." *Clem v. Lomeli*, 566 F.3d 1177, 1182 (9th Cir. 2009) (quoting *Farmer v. Brennan*, 511 U.S. 825, 847 (1994)). To show a prison official failed to take reasonable measures to abate a substantial risk, the plaintiff must show (1) the risk was objectively, sufficiently serious and (2) the defendant acted with a sufficiently culpable state of mind so as to constitute deliberate indifference. *Farmer*, 511 U.S. at 834.

Deliberate indifference is more than "mere negligence" but less than "for the very purpose of causing harm or with knowledge that harm will result"; it is equivalent to criminal subjective recklessness. *Id*. at 835–840. It must be shown that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837. "Constructive notice does not suffice to prove the requisite knowledge, but '[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence.'" *Harrington v. Scribner*, 785 F.3d 1299, 1304 (9th Cir. 2015) (quoting *Farmer*, 511 U.S. at 841–42). "[E]xpert evidence is not required to show deliberate indifference." *Gonzalez v. Ahmed*, 67 F. Supp. 3d 1145, 1156 (N.D. Cal. Sept. 9, 2014).

ORDER DENYING THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 31, 35) - 14

Viewed in the light most favorable to Plaintiff, a reasonable juror could find Sidibe acted with deliberate indifference after encountering Stacy assaulting Woods. Inmate Jones described Sidibe as "uncaring" and "not in any apparent rush" when he encountered Stacy assaulting Woods. (Dkt. No. 42 at 3). Inmate Jones further described Sidibe as "walk[ing] away so slowly that it was clear he didn't care about stopping the fight." (*Id*.)

Sidibe saw Stacy punching Woods repeatedly in the head while Woods was on the ground. (Dkt. No. 34 at 2.) As Sidibe called for backup, Stacy got up and began stomping Woods "to really hurt him." (Dkt. No. 41-1 at 11.) Despite witnessing the brutality of Stacy's assault against Woods, Sidibe chose not to deploy his pepper spray. (Dkt. No 34 at 3.) Sidibe first claimed he did not deploy the pepper spray against Stacy because of the distance, "it was not going to reach him." (Dkt. No. 41-1 at 24.) Sidibe later asserted he chose not to deploy the pepper spray because he would have had to place his hand in between the bars of the gate, exposing him to other inmates possibly grabbing his hand or the pepper spray. (Dkt. No. 34 at 3.) Notwithstanding, the distance from the open bars of the gate to the location where Stacy was assaulting Woods was only about three to four feet. (Dkt. No. 41-3 at 6.) And, importantly, the pepper spray had an effective spray range of approximately 10 to 12 feet. (Dkt. No. 37-2 at 9.)

Under these circumstances, a reasonable juror could find that Sidibe, witnessing such a brutal attack, knew of and disregarded an excessive risk to Woods' health and safety by not deploying his pepper spray against Stacy. He was aware of the severity of the assault and the serious harm that was resulting.

**B. Pierce County**

Plaintiff identifies three actions or inactions by Pierce County that allegedly violate the Eighth Amendment: (1) the absence of policies or training regarding "housing inmates with a

history of predatorily targeting sex offenders in general population;" (2) the absence of policies or training on "offering protective custody to sex offenders"; and (3) the absence of policies or training on "giving sex offenders the opportunity to store their court paperwork outside of their group cell." (Dkt. No 40 at 22.)

Eighth Amendment *Monell* liability is an objective standard. *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1076 (9th Cir. 2016). A municipal entity can be liable under *Monell* when (1) the plaintiff is deprived of a constitutional right, (2) the municipality had a policy, (3) the policy amounts to deliberate indifference to the plaintiff's constitutional right, and (4) the policy is the moving force behind the constitutional violation. *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (quoting *Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997)). Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Com'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410 (1997). A policy of inaction in the face of "actual or constructive notice that a particular omission . . . causes . . . employees to violate . . . constitutional rights" can support a finding of deliberate indifference. *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

Here, there is a triable issue of fact regarding whether Pierce County knew or should have known of the harm Woods could suffer. Pierce County acknowledged that "individuals that have sex offenses against children get assaulted in the jail" and that it was "common knowledge . . . that child molesters are not well-liked among other inmates within the jail and they are subject to being assaulted." (Dkt. No. 41-3 at 8–9.) Pierce County was further aware that assaults against sex offenders, or those accused of sex offenses, occur more than once a month at the jail. (Dkt. No. 36-4 at 12.) And Pierce County recognizes that, "[i]n a perfect

world," sex offense history should be considered in placing inmates within the jail.  (*Id*. at 10.)  Moreover, viewing the facts in the light most favorable to Plaintiff, Pierce County was aware Stacy had assaulted another inmate allegedly based on the other inmate's sex offense history just one month prior to assaulting Woods.  (Dkt. No. 33-4 at 9.)

A reasonable juror could conclude that the absence of policies aimed at protecting sex offenders in the jail was deliberately indifferent to Woods's constitutional right to be free of cruel and unusual punishment and that the absence of such policies were the moving force behind the injuries Woods suffered.

## V      NEGLIGENCE

Plaintiff asserts two theories of negligence: one arising out of Sidibe's actions and one arising out of the County's policies.  (Dkt. No. 40 at 28–30.)  "The essential elements of actionable negligence are: (1) the existence of a duty owed to the complaining party; (2) a breach thereof; (3) a resulting injury; and (4) a proximate cause between the claimed breach and resulting injury." *Pedroza v. Bryant*, 677 P.2d 166, 168 (Wash. 1984) (en banc).  Washington recognizes "a jailer's special relationship with inmates, particularly the duty to ensure health, welfare, and safety." *Gregoire v. City of Oak Harbor*, 244 P.3d 924, 927 (Wash. 2010).  "The duty owed 'is a positive duty arising out of the special relationship that results when a custodian has complete control over a prisoner deprived of liberty.'" *Id*. (quoting *Shea v. City of Spokane*, 562 P.2d 264 (1977), *aff'd*, 578 P.2d 42 (1978)).  "[B]efore the state (or its officials) may be held liable for injury one inmate inflicted [on] another inmate, there must be proof of knowledge on the part of prison officials that such injury will be inflicted, or good reason to anticipate such, and then there must be a showing of negligence on the part of these officials in failing to prevent

the injury." *Brown v. Grimes*, No. C12-5692 RBL-KLS, 2014 WL 129388, *5 (W.D. Wash. Jan. 14, 2024). Both parties have moved for summary judgment on Plaintiff's negligence claims.[6]

A. **Sidibe and *Respondeat Superior*.**

Plaintiff asserts Sidibe "was negligent because he failed take appropriate measures to stop Samual Stacy's attack on Nathaniel Woods, once he learned it was occurring" and that Pierce County is liable for Sidibe's actions based on the doctrine of *respondeat superior*. (Dkt. No. 40 at 7.) Plaintiff focuses on Sidibe's failure to deploy the OC spray to attempt to stop Stacy's attack as it was occurring and Sidibe's lack of engagement as described by inmate Jones. (*Id*. at 28–29.)

There is a question of fact as to whether Sidibe breached his duty to Woods by not deploying the OC spray against Stacy. Stacy was brutally attacking Woods in Sidibe's presence, giving Sidibe knowledge of potential significant injury. Plaintiff's expert opines Sidibe should have attempted to deploy the OC spray and that there was nothing that prevented Sidibe from doing so. (Dkt. 37 at 6.) Sidibe's inaction, according to Plaintiff's expert, was not consistent with the standard of care. (*Id*.) However, Sidibe asserts he did not use the OC spray because of the risks involved in putting his hands between the bars to deploy the spray and because of the distance between him and Stacy. (Dkt. No. 34 at 3.) Whether the circumstances precluded Sidibe from deploying his OC spray is a triable issue of fact for the trier of fact to determine.

---

[6] Plaintiff asserts in a footnote that, "Plaintiff also brought state law tort claims against Sgt. Sidibe individually and intends to argue other theories of negligence if the case proceeds to trial. Because those other negligence theories are factually controversial, Plaintiff brings this motion only on the failure to protect theory of negligence. If the Court grants this motion, Plaintiff will waive the other negligence claims and theories as redundant." (Dkt. No. 35 at 20, fn. 9.) The Court offers no comment as to the other state law claims asserted.

ORDER DENYING THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 31, 35) - 18

In addition, there is a question as to causation between Sidibe's decision not to deploy his OC spray and Woods's injuries. Plaintiff's expert opines only that "the severity of the battery *may well have* been mitigated or stopped." (Dkt. No. 37 at 6) (emphasis added). This opinion, however, may or may not be sufficient for the trier of fact to conclude that Woods's injuries would have been less severe had the spray been deployed.

B. Pierce County

Plaintiff asserts Pierce County was negligent because "it [(1)] failed to separate Mr. Stacy, an inmate known to target sex offenders with violence, from general population; [(2)] did not offer protective custody to Mr. Woods, even though he was a convicted sex offender; and [(3)] did not give Mr. Woods the opportunity to store his court paperwork, marking him as a sex offender, outside of his group cell." (Dkt. No. 40 at 7.)

As to the first basis, there is a genuine issue of material fact as to what Pierce County knew about Stacy and whether Pierce County had "good reason" to anticipate that injury would be inflicted. Pierce County identifies that Duvall, the person Stacy had assaulted one month prior to assaulting Woods, "was not booked on sex crime charges nor charged with a sex crime." (Dkt. No. 43 at 11; *see also* Dkt. No. 33-5.) "In fact, the Pierce County Jail had no information to support that inmate was a sex offender." (Dkt. No. 43 at 11.) Arguably, it is false that Pierce County had knowledge that Stacy had attacked Duvall because of "his sex crimes" (Dkt. No. 33-4 at 9), raising a dispute of material fact about Pierce County's knowledge of Stacy's potential for violence against sex offenders.

As to the second and third bases for finding negligence against Pierce County, it is left to the trier of fact to determine on a more probable than not basis whether Woods' injuries would have been avoided had the County acted differently. The Court is not able to determine whether

ORDER DENYING THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 31, 35) - 19

Woods would have taken advantage of an offer for protective custody or an offer to store his court documents outside of his group cell. The trier of fact could conclude Woods may have declined both offers.

Accordingly, both Parties are denied summary judgment on Plaintiff's negligence claim against Pierce County.

## VI    ORDER

Having considered the Parties' cross-motions for summary judgment (Dkt. Nos. 31, 35), the briefing of the parties, and the remainder of the record, the Court finds and ORDERS that both Parties' motions for summary judgment (Dkt. Nos. 31, 35) are DENIED.

Dated this 6th day of March, 2026.

David G. Estudillo
United States District Judge